March 28, 1979

**79-19** **MEMORANDUM OPINION FOR THE
ASSOCIATE ATTORNEY GENERAL**

**Trading with the Enemy Act (50 U.S.C. App. § 1 *et
seq.*)—Attorney General—Title Claim of the
Commissioner of Customs—Decision of the
Director, Office of Alien Property, Allowing the
Claim Reversed**

In October 1978, at the request of the Attorney General's Office, we reviewed the decision of the Director of the Office of Alien Property of the Department of Justice disposing of five claims remaining under the Trading with the Enemy Act, 50 U.S.C. App. § 1 *et seq.*

We had no problem with the decisions concerning four of the claims; the Director's decision on them was allowed to take effect. However, we believed that one claim—Title Claim No. 63801 filed by the Commissioner of Customs—raised substantial legal questions. Because of these questions, and because a reversal of the Director's decision on this claim would result in the disputed funds (less 5 percent) being paid to private parties rather than to the Treasury, *see* 50 U.S.C. App. §§ 39, 2012, we recommended that, pursuant to the regulations of the Office of Alien Property, 8 CFR § 502.23, the Attorney General order a review of the Director's decision upholding that claim. By virtue of the Attorney General's order to this effect, a final decision on this one claim is now required. Pursuant to 28 U.S.C. § 510, the Attorney General has delegated that function to you. *Id.*

For the reasons given in the attached proposed decision and summarized herein,* we do not believe that the Commissioner of Customs is entitled to file a claim under the Act. We therefore recommend that you reverse the decision of the Director and deny the claim filed by the Commissioner of Customs.

Title Claim No. 63801 originated from Customs' seizure of imported

---

* The decision was signed by the Associate Attorney General on May 8, 1979.

semiprecious and synthetic stones and diamonds in the early 1940s. They were seized for violation of the customs laws and were turned over to the Alien Property Custodian, pursuant to a vesting order issued in 1945, on the ground that they were enemy property; the Custodian later sold them for approximately $1,291,000. Customs later filed a claim for this money, contending that it had proprietary rights in the goods prior to vesting.

The Chief Hearing Examiner of the Office of Alien Property, an entity in this Department and the successor of the Alien Property Custodian, rejected Customs' claim, primarily because, in his opinion, Customs lost its interest in the property when it surrendered the goods to the Alien Property Custodian. The Director of the Office of Alien Property (now the Assistant Attorney General in charge of the Civil Division, 28 CFR § 0.47) reversed this decision, and allowed Customs' claim, on the basis that Customs had an interest in the property cognizable under the Act, an interest not defeated by either the transfer to the Alien Property Custodian or the subsequent sale of the goods.

We believe that another issue not discussed in the Director's initial decision (although briefed in the proceedings and referred to in the Chief Hearing Examiner's decision) is determinative here. The remedies provided in the Act are exclusive, and the pertinent provision of the Act allows only a "person" to file a claim for return of property. The Commissioner of Customs contends that he satisfies this requirement, for the reason that the Act defines "person" to include a "body politic" and that the United States meets this latter definition. We believe, as detailed in the proposed decision, that the structure of the Act, its underlying purposes, the legislative history of the term "person," and judicial authority lead to the conclusion that the United States is not a "person" within the Act and thus may not file a claim for return of property.

LEON ULMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

UNITED STATES DEPARTMENT OF JUSTICE

OFFICE OF THE ASSOCIATE ATTORNEY GENERAL

WASHINGTON, D.C. 20530

# In the Matter of the Commissioner of Customs
# Title Claim No. 63801

# Decision of the Associate Attorney General

Pursuant to the authority vested in the Attorney General by 8 CFR § 502.23, he directed a review of the initial decision of the Director, Office of Alien Property, with respect to Title Claim No. 63801 filed by the Commissioner of Customs under the Trading with the Enemy Act, as amended, 50 U.S.C. App. § 1 *et seq.* The Attorney General pursuant to 28 U.S.C. § 510 has delegated to me the function of rendering a decision on the claim. Upon due consideration of the initial decision of the Director of the Office of Alien Property and the submission of the Commissioner of Customs, I have concluded that the Commissioner of Customs is not entitled to file a claim under section 9(a) of the Trading with the Enemy Act. Accordingly, the decision of the Director of the Office of Alien Property is overruled and Title Claim No. 63801 is hereby denied.

The factual circumstances underlying the claim are set out in detail in the initial decision of the Director of the Office of Alien Property and need not be repeated at any length here. Briefly, the claim relates to the seizure by Customs, for violation of the customs laws, of imported semiprecious and synthetic stones and diamonds in the early 1940s. These commodities were turned over to the Alien Property Custodian pursuant to a vesting order issued in 1945 on the ground that they were enemy property; the Custodian later sold them for a total sum of about $1,291,000. Customs subsequently filed a claim for the proceeds, contending that its seizure gave it proprietary rights in the commodities prior to vesting. Customs also relies on the decision in *von Clemm* v. *Smith,* 255 F. Supp. 353 (S.D.N.Y. 1965), *aff'd,* 363 F. (2d) 19 (2d Cir. 1966), as establishing that the customs laws were, in fact, violated.

The Chief Hearing Examiner of the Office of Alien Property rejected Customs' claim, primarily on the basis that Customs lost its interest in the property due to its surrender of the commodities to the Alien Property Custodian and his subsequent sale of the goods. The Director of the Office of Alien Property disapproved this decision, and allowed Customs' claim, on the basis that Customs had an interest in the property which was cognizable under the Act and which was not defeated by either the transfer

to the Alien Property Custodian or the subsequent sale of the goods.

Section 7(c) of the Act provides that all property conveyed to or seized by the Alien Property Custodian "shall be held, administered and disposed of as elsewhere provided in this Act." 50 U.S.C. App. § 7(c).[1] In this proceeding the Commissioner of Customs has founded his claim under section 9(a) of the Act,[2] which provides in pertinent part:

> Any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States, or to whom any debt may be owing from an enemy or ally of enemy whose property or any part thereof shall have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States may file with the said custodian a notice of his claim under oath and in such form and containing such particulars as the said custodian shall require; and the President, if application is made therefor by the claimant, may order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States, or of the interest therein to which the President shall determine said claimant is entitled.

As is evident from this provision, only a "person" is entitled to file a claim for a return of property. The Commissioner of Customs contends that he satisfies this requirement, on the ground that section 2(c) of the Act defines "person" to include a "body politic," 50 U.S.C. App. § 2(c), and that the United States meets this latter definition. I believe that the structure of the Act, its underlying purposes, the legislative history of the definition of "person," and judicial decisions interpreting that term all refute this interpretation of the Act.[3] I thus conclude that the Commissioner of Customs is not entitled to file a claim under the Act.

---

[1] The decisions construing this provisions have held that the remedies provided in the Act are exclusive. *Becker Steel Company* v. *Cummings,* 296 U.S. 74, 79 (1935); *La Due & Company* v. *Rogers,* 259 F. (2d) 905, 908 (7th Cir. 1958).

[2] Portions of the record might suggest that the Commissioner of Customs' claim is also founded on section 32 of the Act, 5 U.S.C. App. § 32, which provides for administrative relief to certain classes ineligible under section 9(a). I doubt that the Customs' claim is in fact founded on section 32, in light of its explicit statement in the record that "Title Claim No. 63801 is filed in accordance with section 9(a) of the Trading with the Enemy Act." Preliminary Trial Brief of the Commissioner of Customs at 9. In any event, the text in section 32 makes clear that only a "person" is entitled to file claims under that provision, and thus the conclusion and rationale set forth in the text would apply to claims under section 32 as well as under section 9(a).

[3] Although this issue was discussed in the proceedings before the Chief Hearing Examiner, he only briefly mentioned it in his decision, and the Director did not discuss it at all in her decision.

## A.

In my view, an examination of the structure of the Act and the underlying purposes of section 9(a) strongly suggests that Congress did not intend for the United States to be a claimant thereunder. It allows claimants to apply to the Alien Property Custodian for a return of vested property; if a claimant does not obtain administrative relief, he is authorized to bring suit to obtain a return. This provision was deemed by the Congress as "necessary to preserve and protect innocent claimants." S. Rept. No. 111, 65th Cong., 1st sess. 8 (1917); S. Rept. No. 113, 65th Cong., 1st sess. 8 (1917). *See also* H. Rept. No. 85, 65th Cong., 1st sess. 4 (1917). The courts have indicated that, in the absence of such a remedy, the Act would be of doubtful constitutionality. *Becker Steel Company* v. *Cummings, supra,* at 79.

This structure of section 9(a) hardly seems designed to afford the United States a remedy; rather, these factors suggest that the United States was not to have a remedy under that provision. It seems unreasonable to attribute an intent on the part of Congress to allow the United States, in effect, to file claims against itself and then to bring suit against itself in court.[4] Not only does this seem to be wasteful of governmental resources which could be devoted to other efforts, but the possibility of one agency suing the Alien Property Custodian would raise constitutional questions relating to a proper case or controversy. *See, e.g., United States* v. *Easement and Right of Way, Etc.,* 204 F.Supp. 837 (E.D. Tenn. 1962); *The Pietro Campanella,* 47 F.Supp. 374 (D. Md. 1942) (involving a controversy arising under the Trading with the Enemy Act); *but cf., United States* v. *Nixon,* 418 U.S. 683, 692-97 (1974).

To allow this result would seem particularly unjustified in light of the congressional intent underlying section 9(a). As noted above, Congress provided for a remedy in section 9(a) because such was necessary to protect innocent claimants. Since an agent of the United States could already be holding the property, it would hardly seem that the interests of the United States require the protection afforded by that provision. Concededly, Congress provided that the Alien Property Custodian was to make payments to the United States in certain instances—*e.g.,* the payment of taxes, § 24(b), 50 U.S.C. App. § 24(b), and the return of money paid by the United States under license, assignment, or sale of patents, § 27, 50 U.S.C. App. § 27. While such provisions might suggest that Congress believed that the interests of the United States were not fully protected by custody of the property in the hands of the Alien Property Custodian, they also suggest that, where Congress wished to provide for payments by the Alien Property Custodian to the United States, it so

---

[4] The courts have made clear that a suit against the Alien Property Custodian is, in effect, a suit against the United States. *See, e.g., Cummings* v. *Deutsche Bank,* 300 U.S. 115, 118 (1937); *Becker Steel Company* v. *Cummings, supra,* at 78.

provided explicitly.[5] I thus do not believe that section 9(a) was intended by Congress to afford a remedy to the United States.

The fact that the major portion of the excess funds held by the Alien Property Custodian are to be paid into the War Claims Fund, *see* 50 U.S.C. App. §§ 39(d), 2012(a), does not alter this conclusion. Since such funds will not be retained by the United States, but rather will be paid to private parties for war losses, an argument might be made that the interests of the United States would be better served if it would take action under section 9(a) so as to retain the funds. However, I would question, first, whether those interests are any less served by payment to these private parties than by transfer to the Treasury to serve other purposes. Congress has obviously decided that the payments to these private parties is in the interest of the United States, and it is not for the Attorney General to question that judgment. While it might be argued that Congress could only intend to transmit to those private parties such funds that did not belong to the United States or any other proper claimant, this argument appears to me to asssume its own conclusion. If Congress had intended such a result, it presumably would have explicitly so provided in the same way it did in other provisions of the Act where the United States' interests were explicitly preserved.

## B.

The legislative history of the term "body politic" also supports this result. Initially this term was not included in the definition of "person" under the bill. That omission was the occasion of the following colloquy on the House floor:

> Mr. LENROOT. Upon this subject of lienors the bill provides that any person not an enemy having a lien may have a remedy. The word "person" is defined in the bill, but what I want to ask the gentleman is this question: In the case of securities subject to taxation by the State or municipality and upon which they have a lien for tax, under the provisions of this bill the State or municipality will lose all such taxes, will they not?
>
> Mr. MONTAGUE. Why does the gentleman think so?
>
> Mr. LENROOT. Because section 14 provides that there shall

---

[5] This view is supported by the Supreme Court's decision in *Davis* v. *Pringle*, 268 U.S. 315 (1925), where the Court held that the United States was not a "person" for purposes of a provision in the Bankruptcy Act giving priority to debts "owing to any person who by the laws of the States of the United States is entitled to priority." The Court's reasoning could well apply to this case:

It is incredible that after the conspicuous mention of the United States in the first place at the beginning of the section and the grant of a limited priority, Congress should have intended to smuggle in a general preference by muffled words at the end * * *. Elsewhere in cases of possible doubt when the Act means the United States it says the United States. We are of opinion that to extend the definition of 'person' here to the United States would be 'inconsistent with the context.'

126

be no lien upon any of this property except as specifically provided in the bill. That is in section 9, page 14. The word "person" as defined in the bill does not include State governments or municipalities.

Mr. MONTAGUE. The gentleman may be correct, and the definition of "person" may not embrace States or political subdivisions. I incline to believe he is correct and perhaps an amendment should be offered to meet the difficulty. [55 CONG. REC. 4847 (1917).]

The following day this same problem was also addressed:

Mr. WALSH. Mr. Chairman, I offer the following amendment:

The Clerk read as follows:

Page 25, line 23, after the word "corporation," insert "or State or any political or municipal subdivision thereof."

Mr. WALSH. Mr. Chairman, this amendment is offered because the word "person" used in subsequent sections of the act may not include a State, city, or town or any other political subdivision of the State. It might be that an alien enemy would have property situated in some State or some political subdivision of a State upon which property the State or the city or town or township might expect to collect State or local taxes, and this amendment to the definition of the word "person" would permit the State or a municipal, local, or political subdivision of a State to present its claim for the taxes assessed on the property to the custodian of such property provided for in this bill and have that claim adjudicated or passed upon and approved and the money paid over. The State, city, county, township, or whatever subdivision of the State it might be might have a lien on that property for taxes or for betterments and the like, and under the provisions of the bill it is not clear in my opinion that the word "person" as defined in this paragraph and especially used in the sections following would include a city, town, township, or a county or the State.

I have in mind, for instance, where a person who under the provisions of this bill would be classed as an alien enemy, owning a summer estate and that estate being assessed and liable for taxes. I doubt if under the provisions of the bill the town in which that estate is situated would be able to file its claim for taxes with the alien property custodian and receive payment therefor.

Mr. MANN. Will the gentleman yield?

Mr. WALSH. Yes.

Mr. MANN. Does not the word "corporation" include it?

Mr. WALSH. It would not include a State, and it would not include some towns in Massachusetts, for instance, which are not strictly incorporated.

127

Mr. MANN. They do not have to be incorporated.

Mr. WALSH. Well, there is a doubt about it applying to such corporations.

Mr. MANN. Municipal corporation.

Mr. WALSH. Municipal corporation is not included in the division.

Mr. MANN. It says corporation.

Mr. WALSH. But the word corporation as used in the bill, as I have stated, especially in subsequent sections, would, I am inclined to believe be interpreted to mean that it applied only to business or commercial corporations and not to municipal or political corporations. This amendment would clear up the doubt. Certainly after the property got into the custody of the Treasury of the United States or into the custody of this alien-property custodian, if there was any doubt about whether it included a political subdivision of a State and it meant the payment of money, the doubt probably would be resolved against the person: that is to say, the State, county, city, or town that was claiming payment. Certainly it would seem these taxes should not be lost to the State or localities levying them.

Mr. ELSTON. The gentleman is trying to particularize and cover all possible stages. Why can not you say corporation, body politic, or municipal? That would cover everything. If you said body politic it would cover it all.

Mr. WALSH. Well, Mr. Chairman, I ask unanimous consent to withdraw my amendment and substitute therefor, in line 23, page 25, the words "or body politic" after the word "corporation," in view of the suggestion of my learned friend, the gentleman from California [Mr. ELSTON].

The CHAIRMAN. The gentleman from Massachusetts asks unanimous consent to modify his amendment to the extent stated. Is there objection?

There was no objection.

Mr. MILLER of Minnesota. Does the gentleman think that a State is a body politic?

Mr. WALSH. I do not know what else it is if it is not a body politic.

The CHAIRMAN. The Clerk will report the amendment as modified.

The Clerk read as follows:

Page 25, line 23, after the word "corporation," insert "or body politic."

The CHAIRMAN. The question is on the amendment.

Mr. MILLER of Minnesota. Mr. Chairman, I desire to make an inquiry about this term "body politic" of the gentleman from Massachusetts [Mr. WALSH]. I have no doubt but that in a very

general sense a body politic consists of any body or group of individuals grouped together for governmental political purposes. That is old language that used to be current a hundred years ago or more. It has practically disappeared from the textbooks and from the decisions, and in a strictly technical sense I question whether a State is a body politic, as States are organized now as parts of the Federal Government. Why not leave it as it was originally?

Mr. ELSTON. It is not intended to refer to States within the United States at all?

Mr. MILLER of Minnesota. Oh, I understand so. Why not leave that "or corporation, commercial or municipal"?

Mr. WALSH. Does the gentleman desire an answer from me?

Mr. MILLER of Minnesota. I am propounding my inquiry to the distinguished gentleman from Massachusetts.

Mr. WALSH. Mr. Chairman, in answer to the inquiry propounded by the gentleman from Minnesota, I would say that I think a State is a body of citizens upon whom are conferred certain rights by the Congress of the United States in pursuance of the Constitution of the United States. They are given certain duties to perform and are subject to certain liabilities, and certainly that political division could be construed to be a body politic just as much as a city which might be incorporated within a State, by and under the constitution of that State, the citizens of which should be given certain rights and privileges and would be subject to certain liabilities. The State would include the city and the city would be a body politic, certainly; and I think the State would be a body politic, perhaps raised to the "nth" power. Has the gentleman from Illinois [Mr. MANN] completed the search he desired to make?

Mr. MILLER of Minnesota. Does not the gentleman think the language would be improved if he were to strike out the word "or," before the word "corporation," and say "corporation, municipal corporation, or State"? Then there would not be any doubt about it.

The CHAIRMAN. The time of the gentleman from Minnesota has expired.

Mr. WALSH. Mr. Chairman, inasmuch as the modified amendment has been seconded by a member of the committee, I will ask the gentleman from Virginia whether the chairman will accept the amendment?

Mr. MONTAGUE. Mr. Chairman, the amendment is agreeable to me.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Massachusetts.

The amendment was agreed to. [55 CONG. REC. 4917–18 (1917).]

In my view, the genesis and entire focus of this debate was the question whether the states or political subdivisions thereof would be able to present claims to the Alien Property Custodian. In the end, the House amended the term "person" to include a "body politic" so as to allow for this result; and the term was included in the statute as enacted. As such, I believe it would go beyond Congress' intent to include the United States—which was not mentioned at all in the debate—within the term "body politic."

The Commissioner of Customs has raised several objections to such a conclusion. He argues, first, that the United States has been called a "body politic" in the case law, see *United States* v. *Maurice,* 26 Fed. Case No. 15,747 (D. Va. 1823), *see also, United States* v. *Tingey,* 30 U.S. 115, 128 (1831), and the United States must thus be deemed to be such under the Trading with the Enemy Act. He also refers to a definition in *Black's Law Dictionary* 222 (4th ed. 1968) defining body politic as "a social compact by which the whole people convenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good," and, alternatively, as a "state or nation or public associations." Here, however, the determinative question is congressional intent; while the existing case law or accepted definitions might afford some basis for interpreting what Congress meant, the debate on the House floor—which focussed on the states and municipalities and did not mention the United States at all—is a much surer guide to what Congress intended by the term "body politic."

The Commissioner also points to the debate on the House floor as supporting his contention that the United States is a body politic. He first states that the phrase "State or any political or municipal subdivision thereof" was originally suggested in the House, but was withdrawn in favor of the term "body politic." He also refers to the fact that Representative Elston said it would "cover everything," and that Representative Miller stated that he had "no doubt but that in a very general sense a body politic consists of any body or group of individuals grouped together for governmental political purposes." While these aspects of the debate, taken alone, might suggest a broad interpretation of the term body politic, I believe any such interpretation would ignore the underlying genesis and focus of the debate—*i.e.*, the claims of the States and smaller political entities.

### C.

The judicial decisions in this area further support my conclusion. In *United States* v. *Securities Corporation General,* 4 F. (2d) 619, 622 (D.C. Cir. 1925), *aff'd,* 269 U.S. 283 (1925), the court responded to the contention that the United States was entitled to satisfy war claims against Germany out of the funds held by the Alien Property Custodian:

It is nowhere provided in the act that enemy funds in the possession of the defendants may be subjected to the payment of

claims due the United States. *Nor do we think that the United States is a "person," as mentioned in section 9 of the act, or such a party as can take advantage of the provisions thereof. . . .* The fund has been set aside by the act for the satisfaction of such claims as may be legally brought against it by claimants other than the United States. The United States has relinquished any interest it may have had in the fund in favor of creditors of the enemy, in this instance the German government. [Emphasis added.]

In an unreported decision, Judge Faris of the Eastern District of Missouri responded in the same way to a similar contention:

By section 9 of the act it was enacted, however, that the money accruing from such confiscations might be used in paying debts due by the Imperial German Government to loyal citizens of the United States. *It is then, obviously, only upon the theory that the United States is a person, within the meaning of section 9 of the act, that such a view can stand for a minute.* I think this is so obviously erroneous, as I have already briefly attempted to point out, that the matter needs no further exposition* * *.

Again, this fund was, absent section 9, the property of the United States for any use to which the United States wished to devote it. *The very fact that this section was enacted proves that the word "person" in the act does not include the United States.* [Emphasis added.] [*Mercantile Trust Co.* v. *White,* printed in Record at 32–37, *Hicks* v. *Mercantile Trust Company,* 269 U.S. 283 (1925).]

While these decisions dealt with a different issue than the one presented here, the courts clearly believed that the United States was not a person entitled to assert claims under section 9(a).

The Commissioner notes that the Supreme Court, in reviewing these decisions, did not adopt the rationale that the United States was not a "person" within section 9(a). Rather, the Court said:

Even assuming, notwithstanding *Davis* v. *Pringle,* 268 U.S. 315, 318, that the United States is a "person" given the right to sue by § 9, there is no reservation of priority in the Act, or of a right to intermeddle in the private suit of another, or of any advantage that it might have retained as captor of the fund. Whether from magnanimity or forgetfulness, it has assumed the position of a trustee for the benefit of claimants and has renounced the power to assert a claim except on the same footing and in the same way as others, if at all. [*White* v. *Mechanics Securities Corporation,* 269 U.S. 283, 301 (1925).]

The Supreme Court's reference to *Davis* v. *Pringle,* a case in which the Court held that the United States was not a "person" within the meaning of the Bankruptcy Act, could suggest that the Court entertained these same doubts under the Trading with the Enemy Act. In any event, the

131

Court certainly said nothing to refute the lower courts' opinions on this subject, and the fact that it chose an alternate rationale cannot mean that the lower courts' decisions are deprived entirely of their force or persuasive weight. I thus believe that these decisions may legitimately be relied on in support of my conclusion that the United States is not entitled to file a claim under section 9(a).

## D.

One aspect of the Act might suggest a conclusion different than that reached here. Section 24(a) of the Act provides in part:

> The Alien Property Custodian is authorized to pay all taxes (including special assessments), heretofore or hereafter lawfully assessed by any body politic against any money or other property held by him or by the Treasurer of the United States under this Act * * *. [50 U.S.C. App. § 24(a).]

Even though this provision refers only to taxes assessed by a "body politic," Congress intended that it would "permit the Alien Property Custodian to pay all lawful taxes." H. Rept. No. 1565, 67th Cong., 4th sess., 6 (1923). Indeed, the provision has been interpreted to impose a duty on the Alien Property Custodian to pay Federal income taxes. 33 Op. A.G. 511 (1923). This provision could thus suggest that Congress deemed the United States to be a "body politic" under the Act.

I doubt, however, whether this is actually the case, at least with respect to situations involving claims of the United States. As we have discussed above, the structure and underlying purposes of the Act, its legislative history, and judicial decisions all indicate that the United States is not a person within section 9(a). I do not believe that Congress' action on an entirely different topic, and occurring at a separate time,[6] is sufficient to alter the thrust of these authorities which directly bear on the question presented here.

Moreover, it is not entirely clear that Congress itself focused on this issue in enacting section 24(a). This section appears to have been drawn from a similar provision in the sundry civil appropriation act for fiscal year 1919. Act of July 1, 1918, ch. 113, 40 Stat. 646. The term "body politic" in this latter provision was obviously not affected by any of the factors discussed above, and as such may well have been meant to include the United States. The same provision was then inserted, apparently without much deliberation, into the Trading with the Enemy Act. Even though Congress may thus have intended for this provision to encompass the United States, Congress does not appear to have given much thought as to how this provision would operate in the context of this latter Act,

---

[6] While the Trading with the Enemy Act (including section 9) was originally enacted in 1917, the provisions relating to taxes were first inserted into the Act in 1923. *See* Act of March 4, 1923, ch. 285, § 2, 42 Stat. 1516.

particularly in light of that Act's definitions and Congress' intent underlying them.

This point is supported by subsequent congressional action. In 1928 Congress added section 24(b), 50 U.S.C. App. § 24(b), to the Act, which provides in part:

> In the case of income, war-profits, excess-profits, or estate taxes imposed by any Act of Congress, the amount thereof shall, under regulations prescribed by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury, be computed in the same manner (except as hereinafter in this section provided) as though the money or other property had not been seized by or paid to the Alien Property Custodian, and shall be paid as far as practicable, in accordance with subsection (a) of this section.

The amendment was first suggested in the House of Representatives; its sponsor stated that "this amendment is simply *to clear up a doubt* and *protect the Government in the matter of taxation.*" 69 CONG. REC. 903 (1927) (remarks of Representative Green). [Emphasis added.]' While the legislative history does not reveal the "doubt" which occasioned this amendment, it does not seem unreasonable to speculate that it may have arisen due to the limited nature of the term "body politic" in the Act. Since the provision in section 24(a) is otherwise quite broad, and since section 24(b) provides for the payment of taxes in accordance with section 24(a) "as far as practicable," it would seem that section 24(b) does little to achieve its purpose of protecting "the Government in the matter of taxation" except by specifically including the United States' taxes within the Act. As such, the fact that Congress thought such action was necessary would support my conclusion that the United States is not a body politic under the Act.

For the reasons discussed above, I do not believe that the Commissioner of Customs was entitled to file a claim under section 9(a) of the Act. I therefore overrule the decision of the Director of the Office of Alien Property and deny Title Claim 63801.

Dated: May 8, 1979.

/s/ MICHAEL J. EGAN
*Associate Attorney General*

---

' Provisions added in the Senate went beyond this statement of intent, *see* S. Rept. 273, 70th Cong., 1st sess., 34 (1928), but nothing was said in the Senate to cast doubt on this original purpose.